**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PATRICIA J. WALLACE,**

        **Plaintiff,**

-vs-                                          Case No.  6:04-cv-1354-ORL-KRS

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Patricia J. Wallace, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security disability benefits. Doc. No. 1.[1] The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration. Doc. Nos. 7-8. This matter has been referred to me for disposition pursuant to 28 U.S.C. § 636.

**I.     PROCEDURAL HISTORY.**

In March 2001, Wallace filed an application for a period of disability and disability insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of December 31, 1997. TR. 50. Wallace's claim was denied, initially and upon reconsideration. TR. 21-29.

---

[1] Wallace specifically alleges that "[t]his action is an appeal from the Appeal Council's decision denying review of the plaintiff's claim." Doc. No. 1 ¶ 2.

Wallace requested a hearing before an administrative law judge (ALJ), which was held on January 14, 2003.  TR. 30, 384-420.  Wallace, who was represented by an attorney, testified at the hearing.  *Id*.

After considering the testimony and the medical evidence presented, the ALJ found that Wallace had not engaged in substantial gainful activity since the alleged onset date of her disability.[2]  TR. 17.  The ALJ concluded that the medical evidence indicated that Wallace suffered from bilateral sensorineural[3] hearing loss, hypertension, history of bilateral carpal tunnel syndrome repairs, chronic external otitis,[4] allergic rhinitis,[5] tension and migraine headaches, mild leukocytosis, diffuse myalgias[6] and arthralgias[7] of uncertain etiology, and that she had had a hysterectomy.  TR. 15.  The ALJ determined that Wallace's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id*.

---

[2] The ALJ noted that Wallace had "worked off and on until February 2000," but that her earnings were not representative of substantial gainful activity.  TR. 14.

[3] "Sensorineural hearing loss occurs when there is damage to the inner ear (cochlea) or to the nerve pathways from the inner ear (retrocochlear) to the brain. Sensorineural hearing loss cannot be medically or surgically corrected.  It is a permanent loss."  *See* AMERICAN SPEECH-LANGUAGE-HEARING ASSOCIATION, http://www.asha.org/public/hearing/disorders/types.htm (last visited March 9, 2006).

[4] "Inflamation of the ear."  STEDMAN'S MEDICAL DICTIONARY 1272 (26th ed. 1995) (STEDMAN'S).

[5] "Inflamation of the nasal mucous membrane."  STEDMAN'S at 1544.

[6] "Muscular pain."  STEDMAN'S at 1161.

[7] "Severe pain in a joint, especially one not inflammatory in character."  STEDMAN'S at 149.

The ALJ found that Wallace had the residual functional capacity (RFC) "to lift up to 50 pounds occasionally; sit, stand or walk for 6 hours out of an 8 hour day; [with] limited pushing and pulling ; avoid repetitive hand use, noise, hazards and heights; and she require[d] the use of hearing aids." TR. 17.  In reaching this decision, the ALJ noted that Wallace's allegations regarding her limitations were not totally credible. TR. 16.

Based on this RFC and the testimony of a vocational expert (VE) regarding the jobs a claimant with this RFC could perform, ALJ determined that Wallace could perform her past relevant work as a cashier or a maid.  TR. 17.  Accordingly, the ALJ concluded, in a decision dated February 24, 2003, that Wallace was not disabled.  *Id.*

Wallace requested review of the ALJ's decision by the Appeals Council.  TR. 327-28.  She submitted a number of medical records to the Appeals Council that had not been submitted to the ALJ for review, including a neurological evaluation prepared by Jack Rotstein, M.D.  TR. 329-83.  On July 16, 2004, the Appeals Council denied Wallace's request for review.  TR. 5-7.  Although the Appeals Council considered the additional evidence submitted by Wallace, it "found that [the new evidence] does not provide a basis for changing the Administrative Law Judge's decision." TR. 5-6.  Accordingly, the Appeals Council denied the request for review of the ALJ's decision. *Id.*  This appeal timely followed.  Doc. No. 1.

**II.   JURISDICTION.**

Because the Commissioner rendered a final decision, this Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

　　A.    *Wallace's Testimony*.

Wallace was born on April 19, 1949.  TR. 387.  She completed school through the eleventh or twelfth grade.  RR. 67, 388.  She never obtained a GED.  TR. 388-89.  She is 4'9" tall and she weighed 150 pounds at the time of the hearing.  TR. 366, 387.

Wallace previously worked as a maid, cashier, supervisor, assembler, waitress, and building timers for dryers.  TR. 53-55, 62, 81, 390, 395, 397.  In her job as a cashier, Wallace had to supervise about five people.  The job involved standing or walking all of the time.  TR. 397.  In her cleaning job, she swept and vacuumed floors, dusted, and carried out trash.  The job involved a lot of walking, but she did not do any heavy lifting.  TR. 391-93.

Wallace suffered from hearing loss most of her life.  TR. 394, 401.  The hearing loss was initially minor, but it became worse after she got sick.  TR. 401.  Wearing hearing aids caused her to suffer ear infections.  TR. 400.  Wallace had trouble working because of her hearing problems.  She could not pronounce some words well.  She also had trouble talking on the telephone "unless people want to talk loud because [she had] to take the hearing aide out . . . because of the feedback."  TR. 402.

Wallace also had pain and numbness in her legs and knees.  TR. 402.  As a result, she could not sit for longer than twenty-five minutes.  TR. 402, 406.  It also caused her to walk slowly.  TR. 401-03.  She also indicated that she was unable to walk more than ten feet without experiencing pain.  TR. 406.  She was unable to stand for longer than fifteen minutes, and she could not stoop or kneel.  TR. 407.  Bending was also painful.  TR. 406-07.

Additionally, she had pain in her hands. She often dropped things. TR. 403. She estimated that she could lift and carry two to three pounds using both hands. TR. 407. She had difficulty working with her hands and arms overhead. TR. 403. She estimated that she could raise her arms to about shoulder level. It was painful for her to fix her hair. TR. 404.

Wallace had very bad allergies since she had a pneumonia-type illness. TR. 405. Perfumes caused her to choke. TR. 404.

She also suffered from very painful migraines about five times a month. During these episodes, she was sensitive to light and could not move her head. TR. 405. She was beginning to have some problems with her eyesight. TR. 411-12.

During a normal day, Wallace liked to watch television and read. TR. 409. Her husband did most of the housework. *Id.* She did not cook. TR. 411. She was able to drive a car. TR. 389.

B.   *VE testimony*.

The ALJ posed two discrete hypotheticals to the VE at Wallace's hearing. The first hypothetical consisted of the following:

> We have a Claimant who . . . will be considered as a younger person, initially at age 47, and then she turned closely approaching advanced age, so we have both age categories here to consider. The record shows that she has a 12th grade education, but based on her testimony . . . given here today, she says she only has a 11th grade. So let's use 11th grade for all practical purposes. . . . Assume that I find . . . that she can lift – occasionally lift 50 pounds, frequently lift 25 pounds; and that she can stand and/or walk and/or sit about six hours in an eight-hour workday; push and pull will be limited in the – upper extremities. . . . And she should avoid concentrated exposure to noise and working around hazards, such as moving machinery, unprotected heights, deep water, fire. . . . In addition to that, she has a severe bilateral hearing loss that requires the use of hearing aides. Would she be able to perform past relevant work?

TR. 417.  In response to this question, the VE opined that the hypothetical claimant could perform Wallace's past work as a cashier or maid, but not as a waitress, production assembler or machine operator.  TR. 418.

> The ALJ then posed a second hypothetical to the VE, which consisted of the following:
>
> Same person, younger individual until she reached age 50 when she became . . . closely approaching advanced age, with a grade 11 education, work experience as . . . described, assume that I give full credit to the Claimant testimony as given here today, in which is described hearing loss bilateral, but she uses . . . one hearing aide at a time, can't wear hearing aides in both ears because of . . . infections.  She suffers from numbness in both legs.  She has a difficulty with the use of her hands due to arthritis, unable to raise her arms above shoulder-level.  She suffers from allergies to perfumes, which causes her to start choking.  Migraines, that run[] about five a month.  She can sit for 20 to 25 minutes at a time.  She can stand about 15 minutes at a time.  She can walk about 10 feet at a time.  Bending causes her legs to hurt.  The legs – stooping and kneeling, she can't do – can't do.  Lifting and carrying two to three pounds at a time using both hands.  Would she be able to perform any of her past relevant work?

TR. 418.

The VE responded that this hypothetical individual would be unable to perform any of Wallace's past relevant work, and that she would be unable to perform any jobs in the national economy.  TR. 418-19.

>   C.     *Medical Evidence*.
>
>       1.     Evidence Presented to the ALJ.

On July 6, 1992, Richard H. Huster, M.D., examined Wallace for evaluation of bilateral carpal tunnel syndrome.  For the previous twelve months, Wallace had had progressive pain and numbness in both hands.  Nerve conduction studies were indicative of bilateral carpal tunnel syndrome.  Upon examination, Dr. Huster observed slight atrophy of the right hand, with

-6-

decreased sensation in both hands. Tinel's signs were also positive in both hands.[8] TR. 115. Dr. Huster's impression was that Wallace suffered from bilateral carpal tunnel syndrome. *Id*. He performed carpal tunnel release surgery on both hands in July and August 1992. TR. 111-14.

Wallace was treated by Joseph Depeyster, M.D., on July 30, 1996. She reported that she had had hypertension for years. In 1995, she was hospitalized for a severe lower respiratory tract infection and progressed to respiratory failure. Since recovering from that illness, she had problems with her upper respiratory tract that were typical of allergic reactions. TR. 163-64.

In April 1998, Dr. Depeyster determined that Wallace's hypertension was controlled with medication. TR. 161.

On February 2, 1999, Wallace reported feeling dizzy in the morning when she first awakened. TR. 159. She also complained of itching in her ears. *Id*. Dr. Depeyster recommended use of an ear wash. TR. 160.

On March 24, 1999, Wallace was evaluated by Robert P. Collette, M.D. TR. 229. Dr. Collette opined that Wallace suffered from moderate to severe bilateral sensorineural hearing loss. He recommended a hearing aid evaluation. *Id*. Wallace began using hearing aids in December 1999. TR. 187-90.

---

[8] "**Tinel's sign:** An examination test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve. . . . [I]n a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often 'positive' and cause tingling in the thumb, index, and middle fingers." *Definition of Tinel's sign*, MedicineNet.com, found online at http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited March 9, 2006).

On January 4, 2000, Wallace reported that she had been experiencing pain in both ears. TR. 154. Her ears felt like they were "popping," and her hearing had diminished on the right. Dr. Depeyster diagnosed Wallace with bilateral otitis. *Id.* Dr. Depeyster prescribed medication, but it did not relieve Wallace's symptoms. Accordingly, he referred her to a specialist. TR. 152. Wallace returned to Dr. Depeyster in March 2000, complaining of ongoing symptoms of upper respiratory allergies. Dr. Depeyster prescribed Allegra. TR. 152-53.

On July 25, 2000, Wallace reported that she was experiencing pain in the left side of her neck. She also reported typical symptoms of sinusitis, including nasal and sinus stiffness and discolored drainage. She also had extreme fatigue. Dr. Depeyster noted that a blood test had also shown leukocytosis. TR. 149.

On September 15, 2000, Dr. Depeyster noted that Wallace suffered from hypertension, controlled, lumbar muscle strain, headaches, and ear pain. He refilled a Darvocet prescription for her headaches. TR. 147.

On January 11, 2001, Wallace was examined by Devang Shah, M.D., an otolaryngologist. Dr. Shah noted that Wallace's left ear canal was swollen shut with pus, for which he prescribed treatment. Dr. Shah opined that it was possible that Wallace's new hearing aids were irritating her ear canals and causing the problem. TR. 176.

On March 27, 2001, Wallace complained that she was experiencing ongoing ear infections and symptoms in her wrists that she associated with carpal tunnel syndrome. TR. 146. Wallace also noted that she was suffering from migraine and tension headaches. Dr. Depeyster diagnosed Wallace with, among other things: (1) hypertension, controlled; (2) wrist pain possibly secondary

to recurrent carpal tunnel syndrome; (3) recurrent otitis externa; and (4) tension and migraine headaches. *Id*.

In May 2001, Wallace began treatment with Joseph Mirante, M.D., for complaints of hearing loss, ear pain, and a history of allergy and nasal blockage. TR. 216.  On May 24, 2001, Dr. Mirante noted that an audiometric evaluation performed by James R. Timko on the same day, TR. 180, revealed that Wallace suffered from bilateral nerve loss.  TR. 182.  Dr. Mirante recommended that Wallace continue using hearing aids.  *Id*.

On June 11, 2001, Wallace was examined by William Gilmer, M.D., at the request of the SSA.  TR. 125-27.  Wallace complained that she was unable to hold down a job because of poor hearing.  Specifically, Wallace complained that her hearing loss made it almost impossible to communicate with her employers and co-workers.  TR. 125.  Dr. Gilmer noted that Wallace had extremely poor hearing acuity.  Dr. Gilmer commented that "it [was] difficult to communicate with [Wallace]" and that she did "a fair amount of lip reading."  TR. 126.  Dr. Gilmer observed that Wallace had full range of motion in all of her upper extremity joints, including the wrists, elbows and shoulders.  TR. 127.  Her grip strengths were 4/5 bilaterally, and fine manipulation was within normal limits.  Dr. Gilmer's impression was that Wallace suffered from severe bilateral hearing loss, congenital narrowing of the left external canal, and hypertension.  TR. 127.  Dr. Gilmer further opined that Wallace required the use of a hearing aid for her right ear.  *Id*.

On June 26, 2001, Kathy Nick reviewed Wallace's records and prepared a physical RFC assessment at the request of the SSA.  TR. 129-36.  Nick opined that Wallace could frequently lift twenty-five pounds and occasionally lift fifty pounds.  She could sit, stand or walk (with normal

breaks) six hours a day. TR. 130. Her ability to push and/or pull was unlimited. She had no postural limitations. TR. 132. She had a limited ability to hear. TR. 133.

On September 11, 2001, Dr. Depeyster treated Wallace for evaluation and management of hypertension. Wallace complained of typical symptoms of gastroesophageal reflux. He noted that she weighted 166 pounds. TR. 137. She also had recurrent otitis externa and tension and migraine headaches. *See also* TR. 141. Wallace reported that Darvocet-N made her groggy. TR. 138.

A handwritten note in Dr. Depeyster's treatment records reflects that Wallace complained of left arm, right elbow, hand and wrist and right foot numbness in October 2001. TR. 224. On October 25, 2001, Wallace presented to Royce Hood, Jr., M.D., with complaints of left elbow and left foot pain. TR. 197-203. Dr. Hood observed that Wallace walked with an antalgic gait. Her left elbow was tender, but the range of motion was unrestricted. His impression was medial humeral condylitis of the left elbow. He did not determine the reason for Wallace's foot pain. He gave Wallace samples of Celebrex. TR. 197.

On October 8, 2001, Donald Warren Morford, M.D., reviewed Wallace's records and prepared a physical RFC assessment at the request of the SSA. TR. 166-73. Dr. Morford opined that Wallace could frequently lift twenty-fifty pounds and occasionally lift fifty pounds. She could sit, stand or walk (with normal breaks) six hours a day. TR. 167. Her ability to push and/or pull was limited in her upper extremities. Specifically, Dr. Morford noted that Wallace was to avoid repetitive hand use. *Id*. She had no postural limitations. TR. 168. Dr. Morford noted that Wallace suffered from hearing loss, but not listing level. TR. 170. Dr. Morford stated that

Wallace should avoid concentrated exposure to noise and hazards, such as machinery and heights. TR. 170.

In November 2001, Wallace returned to Dr. Hood complaining that she was "hurting all over." TR. 195. Dr. Hood noted that Wallace had a history of neck injury dating back to a motor vehicle accident that took place four years earlier. Dr. Hood noted no neurologic abnormalities during his examination, but he observed that Wallace had mild restriction of motion in her shoulders. He ordered further tests. TR. 195. An MRI taken on November 27, 2001, revealed no spinal canal stenosis or herniated nucleus pulposus or significant disc bulges. TR. 194.

On November 27, 2001, Wallace complained to Dr. Mirante that she was suffering from hearing loss. Dr. Mirante performed a cerumen disimpaction, which Wallace tolerated well. TR. 178. Dr. Mirante noted that Wallace had a history of significant nerve hearing loss. He recommended against employment that would place Wallace in a "kitchen setting." Dr. Mirante opined that due to surrounding nosie, Wallace would "have a difficult time with communication in this setting . . . ." *Id*.

Dr. Hood opined in January 2002, that an MRI had not shown any visible anatomic abnormality to explain Wallace's continuing complaints of diffuse pain and numbness. TR. 325.

On April 15, 2002, Wallace presented to Dr. Depeyster with complaints of exercise-induced pain in both legs, including pain in her calves and numbness in her toes. TR. 222. Wallace also reported that she had been experiencing swelling in her ankles. Dr. Depeyster noted

that Wallace suffered from, among other things, dysphagia,[9] reduced auditory acuity, and recurrent otitis externa. *Id*.

On April 23, 2002, Wallace was evaluated by Pedro Arroyo, M.D., at the request of Dr. Depeyster. TR. 236-37. Dr. Arroyo submitted a cardiovascular report, in which he noted no significant abnormalities. TR. 237.

On May 9, 2002, Dr. Mirante performed another cerumen disimpaction on Wallace, which she tolerated well. TR. 210. Dr. Mirante noted that Wallace had dysphagia, with acid reflux disease and esophageal symptoms. TR. 210.

On July 23, 2002, Dr. Depeyster noted that Wallace was still experiencing myalgias and arthralgias in multiple locations involving both of her arms and her legs. TR. 221. Her left wrist was more painful than other locations. Wallace also suffered from paresthesias[10] in her feet, generalized weakness, and fatigue. Dr. Depeyster observed that Wallace stood up slowly from the exam room chair due to pain from her hips and knees. Her muscles were poor in multiple locations, including her biceps, quadriceps, and calves. *Id*.

On July 29, 2002, Wallace was examined by Neeraj Sharma, M.D. TR. 231-33. Wallace reported symptoms suggestive of myalgia and arthralgias. She also complained of pain in her forearms as well as in her knee joints. Dr. Sharma diagnosed Wallace with persistent leukocytosis. TR. 232.

---

[9] "Difficulty in swallowing." STEDMAN'S at 534.

[10] "An abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S at 1300.

On September 10, 2002, Wallace underwent a total abdominal hysterectomy to have a pelvic mass removed. TR. 274.

On October 4, 2002, Wallace presented to Dr. Mirante with complaints of ear blockage. Dr. Mirante's assessment was that Wallace suffered from external otitis. TR. 209.

Bhupendra Patel, M.D., began treating Wallace on October 24, 2002. TR. 318. In November 2002, Wallace complained of abdominal pain, associated at least in part with an infection. TR. 318-19.

2.      Additional Evidence Presented to the Appeals Council.

The records presented to the Appeals Council include hospitalization records dated March 1995 related to Wallace's acute respiratory failure. Her physician was Dr. Patel. TR. 341.

They also include a record of treatment by Albert J. Razzetti, M.D., in October 1997. Dr. Razzetti's impression was possible early chronic obstructive pulmonary disease and decreased hearing, among other things. TR. 344-45.

Wallace also presented additional records of treatment by Dr. Depeyster in March and July 2002. These records reflect Wallace's complaints of burning legs and feet and pain in her toes, as well as pain when walking fast. TR. 349-50. She also complained of being thirsty and lightheaded. TR. 350.

On October 27, 2003, Wallace was examined by Jack Rotstein, M.D., a psychiatrist and neurologist. TR. 364. Dr. Rotstein noted that Wallace's symptoms consisted of blurred vision, headaches with photophobia and sonophobia, bilateral deafness, neck and low back pain, frequent ear infections, pain and numbness in both feet and hands, weakness in her hands, wrists and arms,

and pain in her ankle, knee and hip. She also had a mild balance problem. She weighed 164 ½ pounds. TR. 366. De Quervain's sign[11] was positive with tender percussion producing sharp pain radiating forward on the thumb. TR. 367. Tinel's sign also appears to have been positive bilaterally in her elbows and ulnar wrists. Examination of Wallace's cerebellar function revealed that she had difficulty alternating movements with her left foot. *Id*. Sensation testing revealed decreased median nerve distribution bilaterally. Her proprioception[12] was poor in her hands, and she was unable to appreciate it in her feet. Vibration was absent in her left foot. TR. 368. Dr. Rotstein's diagnosis included the following findings: moderate obesity; bilateral carpal tunnel syndrome and de Quervain's syndrome; depressive disorder; meralgia paresthetica[13] on the right; osteoarthritis[14] of the metacarpal[15] C-MC joints. TR. 371.

---

[11] "De Quervain's disease is swelling and inflammation of the tendons and the tendon sheath on the thumb side of the wrist." *See* WEBMD, http://www.webmd.com/hw/health_guide_atoz/aa70458.asp (last visited March 9, 2006).

[12] "A sense or perception, usually at a subconscious level, of the movements and position of the body and especially its limbs, independent of vision; this sense is gained primarily from input from sensory nerve terminals in muscles and tendons (muscle spindles) and the fibrous capsule of joints combined with input from the vestibular apparatus." STEDMAN'S at 1439.

[13] "[T]ingling, formication, itching, and other forms of paresthesia in the outer side of the lower part of the thigh in the area of distribution of the lateral femoral [relating to the femur or thigh] cutaneous [relating to the skin] nerve; there may be pain, but the skin is usually hypesthetic to the touch." STEDMAN'S at 424, 635, 1090.

[14] Osteoarthritis is a joint disease that mostly affects the cartilage. *See* NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, http://www.niams.nih.gov/hi/topics/arthritis/oahandout.htm#1 (last visited March 9, 2006).

[15] Relating to the metacarpus (the five bones of the hand between the carpus and phalanges)." STEDMAN'S at 1097. Phalanges are the long bones of the digits. *Id*. at 1339.

On November 11, 2003, Wallace complained that the numbness had gotten worse. TR. 372  Dr. Rotstein noted that sensory nerve conduction studies revealed that Wallace had carpal tunnel syndrome on the right and axonal sensory peripheral neuropathy. TR. 374-76, 379.  An MRI taken in December 2003 revealed a minimal generalized disk bulge at L5-S1. TR. 382.

On March 23, 2004, Wallace complained of pain in her right knee and other pain and tenderness. TR. 383.  Dr. Rotstein diagnosed Wallace with, among other things, moderate obesity, bilateral carpal tunnel syndrome, bilateral de Quervain's syndrome, bicipital tendonitis, depressive disorder, hypertension, meralgia paresthetica, and osteoarthritis of the 1st carpometacarpal.[16]  TR. 373.

## IV.   STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986).  While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000.  Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial

---

[16] Relating to both carpus (wrist) and metacarpus (the five bones of the hand between the carpus and phalanges). STEDMAN'S at 285, 1097, 1439.

evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id.* In addition, evidence presented to the Appeals Council that was not presented to the ALJ is considered part of the record on appeal. *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits. In sum, when evaluating a claim for benefits under OASDI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment or combination of impairments severe?
> (3) Does the claimant's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?[17]

20 C.F.R. § 404.1520(a)(4).

---

[17] In an OASDI case, a claimant must establish that she was disabled during the time that she was insured under the act. *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel*, 800 F.2d at 1030.

When, as here, the claimant asserts that the Appeals Council erred as a matter of law by denying review despite new evidence being presented, the Court "will have to look at the pertinent evidence to determine if the evidence is new and material, the kind of evidence the [Appeals Council] must consider in making its decision whether to review an ALJ's decision. *See* 20 C.F.R. § 404.970(b)('Appeals Council *shall* evaluate the entire record including the new and material evidence submitted to it if it relates to the period on or before the date of the administrative law judge hearing decision.')(emphasis added); 20 C.F.R. § 416.1470(b)(same)." *Falge*, 150 F.3d at 1324; *accord Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1300-03 (M.D. Fla. 2005) (holding that a denial of review by the Appeals Council is subject to judicial review for error).

## V.   ANALYSIS.

Wallace's arguments are primarily based on the Appeals Council's failure to review the ALJ's decision in light of the opinion of Dr. Rotstein. Wallace contends that the Commissioner did not give substantial weight to this opinion. Wallace also contends that the ALJ erred in evaluating the limitations arising from her pain and other subjective symptoms, and that she improperly delegated the determination of whether she could perform past relevant work to a vocational expert. *Id*. at 11-15. I address only the failure to consider the evidence presented to the Appeals Council, because I find it to be dispositive.

With respect to Wallace's testimony regarding the functional limitations arising from pain and other subjective symptoms, the ALJ concluded as follows:

> [T]he undersigned notes that there is little evidence to support her allegations. There is no evidence of a diagnosis of arthritis in her hands or other part of the body. An MRI scan of the cervical spine was normal. Examinations have demonstrated only mild tenderness in the left elbow and left foot. She demonstrated unrestricted range of motion in all joints. She has a severe hearing loss, but has functioned with this most of her adult life. She requires hearing aids. She has chronic otitis externa, but there is no evidence that she has had to remove her hearing aids for long periods of time. Her allegations of significant limitations on sitting, standing, walking and lifting are not supported by any objective findings of an impairment which would generally be associated with such limitations. Her treating physicians have found no etiology for her complaints of diffuse myalgias and arthralgias. Accordingly, little weight can be given to her testimony.

TR. 16. Dr. Rotstein's records, presented for the first time to the Appeals Council, provide medical support in many of the areas that the ALJ found lacking. These include sensory nerve conduction studies that revealed a recurrence of carpal tunnel syndrome on the right and axonal sensory peripheral neuropathy, and osteoarthritis in Wallace's hand. Dr. Rotstein's testing revealed that Wallace had a loss of sensation in her feet, and difficulty performing alternating movements with her left foot, which provided support for Wallace's testimony about her limitations in the ability to sit, stand and walk.

When the Appeals Council denies a request for review based on new evidence, the district court may remand the matter to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g) for further consideration if it determines the evidence presented to the Appeals Council is: (1) new and noncumulative; (2) material in that it is relevant and probative so that a reasonable probability

exists that it would change the result; and (3) that there is good cause for the failure to submit the evidence at the administrative level. *Keeton*, 21 F.3d at 1068 (citing *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988)); *see also Falge*, 150 F.3d at 1323-24 ("We accept that, if an applicant can show good cause for his failure to introduce evidence during a hearing before the ALJ (even if the evidence was available to the applicant before the ALJ's decision) courts may consider that evidence in deciding whether the case should be remanded for further administrative proceedings to include the new evidence."). When the claimant contends that the Appeals Council erred in failing to consider the new evidence, the Court may also reverse the decision of the Appeals Council under sentence four if it concludes that the Appeals Council erred as a matter of law. *Williams*, 407 F. Supp. 2d at 1300-03.

As discussed above, the records of Dr. Rotstein are new and noncumulative evidence because Dr. Rotstein's findings undercut some of the ALJ's stated reasons for discrediting Wallace's testimony. *See Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1218 (11th Cir. 2001) (finding that evidence of a herniated disc discovered after an ALJ rendered a decision was "material because it contradict[ed] the ALJ's findings and conclusions regarding the severity of [the claimant's] spinal problems."). Because the VE testified that if Wallace's testimony was accepted, she would be unable to work, there is a reasonable probability that if the Commissioner found that Dr. Rotstein's opinion supported Wallace's testimony, the outcome of the case would be different. Finally, there is good cause for Wallace's failure to present Dr. Rotstein's opinion to the ALJ because Dr. Rotstein did not begin treating Wallace until after the ALJ's decision was rendered. *Id.* at 1218-19.

This is not a case in which the new evidence addresses impairments that were not related to the impairments considered by the ALJ.  The ALJ found that Wallace had a number of impairments other than hearing loss, including myalgias and arthralgias, and Wallace testified about functional limitations that are supported by Dr. Rotstein's findings.   Under these circumstances, the Appeals Council erred as a matter of law by failing to review the decision of the ALJ based upon the new evidence.

## VI.   CONCLUSION.

Based on the foregoing analysis, it is **ORDERED** that this matter is **REVERSED** and the case is **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of Court is directed to enter a judgment reversing and remanding the decision of the Commissioner of Social Security and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 9th day of March, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

Counsel of Record
Unrepresented Parties